UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ROBERT MAKOWSKI,

                       Plaintiff,

        - against -

UNITED BROTHERHOOD OF CARPENTERS
AND JOINERS OF AMERICA, et al.,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED #: 8/2/10

08 Civ. 6150 (PAC)

MEMORANDUM
OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Robert Makowski is a carpenter who plies his trade in New York City. Since 1998, he has been a member of the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America ("District Council"), a labor union representing carpenters in New York City and the surrounding region. For decades, the District Council has been plagued by corruption. Plaintiff claims to have been harmed by the corruption, and he brings this action seeking (among other things) treble damages for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. The Amended Complaint asserts twelve substantive RICO claims under 18 U.S.C. § 1962(c), six RICO conspiracy claims under 18 U.S.C. § 1962(d), and an intentional infliction of emotional distress claim under New York law.

There are twenty-one specifically named defendants, including: the District Council; four of its constituent local unions ("Locals"); the District Council's parent union, the United Brotherhood of Carpenters and Joiners of America ("UBC"); and the UBC's president, Douglas McCarron ("McCarron"). Two of the District Council's officers and eight of the Locals' officers, business agents, shop stewards and delegates

("Individual Defendants"), along with four allegedly corrupt contractors ("Contractor Defendants"), are also named as defendants.[1]  In addition to the specifically named defendants, the Amended Complaint asserts claims against a host of "John Does."

According to the Amended Complaint, Defendants conducted a RICO enterprise through a long-running pattern of racketeering activity.  Plaintiff claims that Defendants' racketeering activity harmed all union members, himself included.  This action is not, however, a class action; Plaintiff seeks recovery on his own behalf.   As predicate acts, Plaintiff alleges that the Defendants violated 18 U.S.C. § 664 (embezzlement from employee benefit plan); 18 U.S.C § 1954 (illegal payments to influence the operations of employee benefit plan); 29 U.S.C. § 186 (illegal payments to union representatives); 18 U.S.C. § 1951 (extortion); and state criminal laws prohibiting bribery and extortion. Plaintiff maintains that the conduct of some Defendants was so utterly intolerable that it transcended the bounds of human decency and caused him severe emotional distress.

Three motions to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure are pending.  The UBC and McCarron join in one motion.  The District Council and seven of the Individual Defendants join in another. One of the Contractor Defendants has filed a motion to dismiss of its own.[2]

The Moving Defendants challenge the viability of Plaintiff's RICO claims on a number of grounds.  Several of the arguments for dismissal overlap, and many have merit.  There is, however, no need to address all of the proffered arguments.  Despite its length (90 pages), the Amended Complaint fails to allege a cognizable injury, and Plaintiff therefore lacks standing to sue under RICO.  The Moving Defendants against

---

[1] Three of the Individual Defendants and two of the Contractor Defendants have apparently been served but have not appeared in the action.

[2] Anther Contractor Defendant, Ahern Painting Contractors, Inc. ("Ahern"), also filed a motion to dismiss. On July 12, 2010, the Court entered a Stipulation of Partial Discontinuance dismissing Ahern from the action with prejudice.  Ahern's motion to dismiss is accordingly DENIED as moot.

whom the intentional infliction of emotional distress claim is asserted argue that the

claim is time-barred, and in any event, fails on its merits. The Court agrees.

Accordingly, and for the reasons that follow, the motions to dismiss are GRANTED.

Since Plaintiff has failed to state a viable claim against any Defendant, the Amended

Complaint is DISMISSED, sua sponte, in its entirety.

## Background

### I. Facts[3]

The Amended Complaint catalogs numerous crimes committed in conjunction

with organized crime's infiltration of the District Council and its various local unions.

(Am. Compl. ¶¶ 41-135). Many of the alleged criminal acts (which stretch back to 1976)

do not involve any of the Defendants. (Id. ¶¶ 44-47, 70-76, 106-109, 112-113). Plaintiff

asserts, however, that the non-parties who engaged in criminal behavior were "agents" of

the UBC, the District Council and the Locals and that "they are therefore vicariously

liable." (Id. ¶¶ 106-109, 112-113).

In 1990, the United States commenced a civil RICO action (the "1990 RICO

Action") against the District Council and a number of its officials. (Id. ¶ 48). Although

Plaintiff alleges otherwise, (id.), the UBC was not a party to the action. See Docket in

United States v. N.Y.C. District Council of N.Y.C. & Vicinity of the United Brotherhood

of Carpenters, et al., No. 1:90-cv-05722.[4] The 1990 RICO Action led to the resignation

of the District Council's president, who Plaintiff alleges was "long believed to be

---

[3] The 90-page Amended Complaint contains 512 numbered paragraphs, some of which have numerous subparts. The factual allegations are divided into two sections. The first section, consisting of 16 pages, is devoted largely to recounting the sordid history of the District Council and its local unions. (Am. Comp. ¶¶ 41-135). The second section, titled "Facts Specific to Plaintiff," is 21 pages long and sets forth the abuses allegedly suffered by Plaintiff at the hands of the Defendants. (Id. ¶¶ 136-299).

[4] The Court takes judicial notice of the docket and filings in the 1990 civil RICO action. See Massey v. Fischer, Nos. 08 Civ. 6098(CM), 09 Civ. 5911(CM), 2010 WL 234999, at *2 (S.D.N.Y. Jan. 19, 2010) Inasmuch as Plaintiff's allegation that the UBC was a party to the 1990 RICO Action is flatly contradicted by the docket in the 1990 RICO Action, the Court need not accept the allegation as true. See Rapoport v. Asia Elec. Holding Co., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

committing various RICO predicate acts." (Id. ¶ 49).  On March 4, 1994, the District

Council and the United States entered into a consent decree (the "Consent Decree") and

the United States dismissed its RICO claims.  (Id. ¶ 50; Consent Decree, UBC and

McCarron Mem. in Supp. Mot. to Dismiss ("UBC/McCarron Mem."), Ex. A).

        The Consent Decree barred the District Council from having contacts with

organized crime, established an independent investigator to help ferret out corruption,

and required the District Council to set up a system of "job referral rules."  (Am. Compl.

¶¶ 51-52, 54; Consent Decree, UBC/McCarron Mem., Ex. A).  The Amended Complaint

refers to the "out-of-work list" established by the job referral rules, (Am. Compl. ¶ 52),

but never explains how the out-of-work list operates.  The Amended Complaint also

makes reference to the "50/50 requirement," (id. ¶ 85), but never says what the

requirement is.  Repeated reference is made to "the collective bargaining agreement," (id.

¶ 38), but who the parties to the collective bargaining agreement ("CBA") are is left to

speculation.

        In ruling on an appeal from the 1990 RICO Action, the Second Circuit explained

that the out-of-work list "require[s] [out of work union] members . . . [on the list] to be

referred to jobs in the order in which they have registered their availability for referral."

United States v. N.Y.C. Dist. Council of N.Y.C. & Vicinity of the Bhd. of Carpenters &

Joiners of Am., 229 F. App'x 14, 16 (2d Cir. 2007).  Judge Haight described the "50/50

Rule" as follows:

> [The] "50/50 Rule," found in all of the District Council's collective
> bargaining agreements at the time of the [1994] Consent Decree,
> authorize[es] the union to assign fifty percent of the carpenter workforce
> at a job site (with the company designating the other fifty percent). . . .
> Since the Job Referral Rules require[] carpenters to be assigned to jobs
> from the out-of-work list . . . and the CBAs allow[] the union to assign
> fifty percent of the carpenters to any job site, the combined effect [is] to

create a major source of job opportunities for members who had been seeking work for the longest period of time.

United States v. District Council of New York City & Vicinity of the United Bhd. of Carpenters & Joiners of Am., 409 F. Supp. 2d 439, 444 (S.D.N.Y. 2006) (internal quotation marks and citations omitted).

Plaintiff alleges that contractors bribed union officials to allow the contractors to use "off-the-sheet workers." (Am. Compl. ¶ 84). An off-the-sheet worker, Plaintiff explains, is not on the shop steward's report. (Id. ¶ 85). As a result, the worker is not counted for purposes of the out-of-work list and the 50/50 Rule. (Id.) This violates the job referral rules and the Consent Decree. (Id.) According to Plaintiff, the use of off-the-sheet workers "requires" the participation of both a local union official and the shop steward. (Id. ¶¶ 86-87). Participation is "usually" obtained through a bribe. (Id.) When an upstanding shop steward cannot be bribed, the bribed local official either removes the shop steward or resorts to threats of violence. (Id. ¶ 88).

Contractors profit from the use of off-the-sheet workers by not having to pay union wages. (Id. ¶ 96). Bribed union officials and shop stewards are able to provide jobs for their cronies. (Id. ¶ 97). The "union organization defendants" (defined as the UBC, the District Council, and the Locals) allegedly gain a "competitive advantage over nonunion labor, or . . . reduce[] a competitive disadvantage they had against non-union labor. This enable[s] [the] union organization[] defendants to retain or gain a market share in the construction industry they would not have gained by enforcing the job referral rules, the Consent Decree and the CBA." (Id. ¶ 98).

The use of off-the-sheet workers comes at a cost to all union members, including Plaintiff. According to the Amended Complaint, union members are forced to spend extra time on the out-of-work list "because less workers are selected off the list due to the

presence of the off the sheet workers." (<u>Id.</u> ¶ 93). As a result, union members lose wages and benefits "they would have been paid if not for the use of the off the sheet workers." (<u>Id.</u> ¶ 95). Union members are also allegedly harmed "by the loss of money not paid into the general union pension and benefits funds." (<u>Id.</u> ¶ 93).

According to Plaintiff, all of the Defendants were involved – in one way or another – in perpetrating off-the-sheet worker schemes. (<u>Id.</u> ¶¶ 62-67, 94-98). In addition to giving and receiving bribes, the Defendants allegedly used violence and threats of violence "to extort both tangible and intangible property of union members, including, but not limited to plaintiff." (<u>Id.</u> ¶¶ 66-67). The bribery, theft and extortion was allegedly committed by the Defendants as "members of a vast enterprise which unlawfully amassed millions of dollars by violating union rules (including the CBA, job referral rules and the Consent Decree), thereby unlawfully depriving, and continuing to deprive, union workers, including plaintiff, of their rightful wages, benefits, and other interests, including, but not limited to, protected speech and the right to file a grievance to redress violations of the abovementioned union rules." (<u>Id.</u> ¶ 102.)

The Amended Complaint goes on at length describing the misdeeds of the Defendants and other non-parties. (<u>Id.</u> ¶¶ 106-287). Many of the allegations are based on inferences which Plaintiff claims are "reasonable." (<u>Id.</u> ¶¶ 122, 126, 184, 195, 206, 225, 230, 254-55, 280, 287). For instance, Plaintiff repeatedly alleges that the presence of off-the-sheet workers at various jobsites "proximately leads to the reasonable belief" that the Defendants paid and received bribes. (<u>Id.</u> ¶¶ 195, 197, 206, 225, 230, 254-55, 290). Plaintiff also alleges that a number of the Defendants "aided and abetted" crimes committed by others. (<u>Id.</u> ¶¶ 114, 115, 116, 143, 163, 204, 232, 281).

The allegations directly involving Plaintiff all relate to his experience working for ten different contractors (including three of the Contractor Defendants) from 2003-2007. (Id. ¶¶ 137-287).  The gist of Plaintiff's allegations is that when he went to work for the contractors, he discovered the use of off-the-sheet workers and other violations of the CBA and Consent Decree.  (Id. ¶¶ 141, 180, 194, 201-02, 209, 217, 238, 256, 269, 284).  The presence of off-the-sheet workers, according to the Amended Complaint, means that bribes were being paid by the contractors (including the Contractor Defendants) to the Individual Defendants and to other officials of the District Council and the Locals.  (Id. ¶¶ 161, 184, 195, 225).

When Plaintiff complained or filed a grievance about the off-the-sheet workers and other violations, he was threatened by the Individual Defendants and by employees of the Contractor Defendants.  (Id. ¶¶ 145-46, 161, 170-72, 210, 221-23, 273).  The threats and other alleged acts of intimidation prevented Plaintiff from pursuing grievances and forced him to "give up his intangible rights" under the Consent Decree, CBA, and federal law.  (Id. ¶¶ 146, 155, 161, 172, 184, 210, 215, 224, 229, 233, 245, 254-55, 261, 265, 273).  After he complained about the off-the-sheet workers and other violations, Plaintiff was fired by seven different contractors.  (Id. ¶¶ 153-54, 182, 213, 226, 234, 245, 265, 286-87).  According to Plaintiff, he was fired because he exercised his rights under the CBA and federal law.  (Id.)

## II. Procedural History

Plaintiff commenced this action on July 2, 2008.  After various Defendants moved to dismiss, Plaintiff filed a nineteen-count Amended Complaint on January 6, 2009.  Counts I through XII assert parallel substantive RICO and RICO conspiracy claims.

Counts XIII through XVIII assert substantive RICO claims.  Count XIX is for intentional infliction of emotional distress.

The Moving Defendants filed their motions to dismiss in November, 2008.  Plaintiff filed an omnibus response, and all of the Moving Defendants replied.  The motions were fully briefed on February 17, 2010.

## Discussion

### III. Standard of Review

In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court assumes all facts alleged in the complaint are true, and draws all reasonable inferences in favor of the plaintiff.  Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).  Incantation of the "elements of a cause of action, supported by mere conclusory statements, do not suffice . . . .  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949-50 (2009).  To avoid dismissal, the complaint must contain "enough facts to state a claim to relief that is plausible on its face," that is to say facts that "nudge [] [the plaintiff's] claims across the line from conceivable to plausible . . . ."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Plausibility, in turn, requires only that the allegations in the complaint "raise a reasonable expectation that discovery will reveal evidence" in support of the claim.  Id. at 556; see also Arar v. Ashcroft, 585 F.3d 559, 617 (2d Cir. 2009).

### IV. RICO

### a. The Elements of a RICO Claim

RICO was enacted to "prevent organized crime from infiltrating America's legitimate business organizations."  Moccio v. Cablevision Sys. Corp., 208 F. Supp. 2d

361, 371 (E.D.N.Y. 2002).  The Act contains both criminal and civil provisions.  See 18

U.S.C. §§ 1962, 1964.  Civil liability "comes with treble damages and attorney's fees

attached."  Hemi Group, LLC v. City of New York, __ U.S. __, 130 S. Ct. 983, 994

(2010) (plurality opinion); see 18 U.S.C. § 1964(c).  The potential for such recovery is, of

course, attractive to plaintiffs.  But "[b]ecause the mere assertion of a RICO claim has an

almost inevitable stigmatizing effect on those named as defendants, courts should strive

to flush out frivolous RICO allegations at an early stage of the litigation."  Allstate Ins.

Co. v. Valley Physical Med. & Rehabilitation, P.C., No. 05-5934(DHR)(MLO), 2009 WL

3245388, at *3 (E.D.N.Y. Sept. 30, 2009) (quoting Bell v. Hubbert, 95 Civ.

10456(RWS), 2007 WL 60513, at *5 (S.D.N.Y. Jan. 8, 2007)).

Section 1964(c) of Title 18, United States Code, provides the basis for civil RICO

liability.[5]  To establish a RICO claim, "a plaintiff must show: '(1) a violation of the RICO

statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury

was caused by the violation of Section 1962.'"  DeFalco v. Bernas, 244 F.3d 286, 305 (2d

Cir. 2001) (quoting Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp., 101 F.3d 900,

904 (2d Cir. 1996)).

Section 1962 contains three substantive provisions, § 1962(a)-(c), and a

conspiracy provision, § 1962(d).  Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any
> enterprise engaged in, or the activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or indirectly, in the conduct
> of such enterprise's affairs though a pattern of racketeering activity or
> collection of unlawful debt.

---

[5] In relevant part, § 1964(c) provides: "Any person injured in his business or property by reason of a
violation of section 1962 of this chapter may sue therefore in any appropriate United States district court
and shall recover threefold damages he sustains and the cost of the suit, including reasonable attorney's
fees . . . ."

§ 1962(c).  To state a substantive RICO claim under § 1962(c), the plaintiff must allege

"(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Wood

v. Village of Patchogue, 311 F. Supp. 2d 344, 356 (E.D.N.Y. 2004) (quoting DeFalco,

244 F.3d at 306 (2d Cir. 2001)).  "The focus of section 1962(c) is on the individual

patterns of racketeering engaged in by a defendant, rather than the collective activities of

the members of the enterprise . . . ." United States v. Persico, 832 F.2d 705, 714 (2d Cir.

1987).  Given this focus, "[t]he requirements of section 1962(c) must be established as to

each individual defendant." DeFalco, 244 F.3d at 306; see also Gross v. Waywell, 628 F.

Supp. 2d 475, 485 (S.D.N.Y. 2009).

Section 1962(d) makes it "unlawful for any person to conspire to violate any of

the provisions of subsection (a), (b), or (c) of this section."  To state a RICO conspiracy

claim, the plaintiff must allege that the defendants "agreed to form and associate

themselves with a RICO enterprise and that they agreed to commit two predicate acts in

furtherance of a pattern of racketeering activity in connection with the enterprise." Conte

v. Newsday, Inc., __ F. Supp. 2d __, No. 06-CV-4859(JFB)(ETB), 2010 WL 1257887, at

*3 (E.D.N.Y. Mar. 25, 2010) (quoting Cofacredit, S.A. v. Windsor Pumbing Supply Co.,

187 F.3d 229, 244 (2d Cir. 1999)).  More specifically, the plaintiff must allege "that each

defendant, by words or actions, manifested an agreement to commit two predicate acts in

furtherance of the common purpose of a RICO enterprise." Colony at Holbrook, Inc. v.

Strata G.C., Inc., 928 F. Supp. 1224, 1238 (E.D.N.Y. 1996).  And that "each co-

conspirator knew the conspiracy's goals and agreed to facilitate them." State Farm Mut.

Auto. Ins. Co. v. CPT Med. Servs., P.C., No. 04 CV 5040(ILG), 2008 WL 4146190, at

*14 (E.D.N.Y. Sept. 5, 2008) (citing Baisch v. Gallina, 346 F.3d 366, 377 (2d Cir.

2003)).

The Moving Defendants attack Plaintiff's RICO claims from a variety of angles. Among other arguments, they contend that Plaintiff has not alleged a RICO enterprise and that the Amended Complaint fails to describe a pattern of racketeering activity. Some of the Moving Defendants argue that they cannot be held vicariously liable for the alleged predicate acts and that the imposition of vicarious liability will violate the rule requiring RICO "persons" and "enterprises" to be distinct. Others take the position that aiding and abetting a RICO violation does not give rise to civil liability. As for the RICO conspiracy claims, all of the Moving Defendants argue that Plaintiff has failed to sufficiently plead that there was an agreement to commit the alleged predicate acts. While many of these arguments have merit, the Court need not address them because Plaintiff does not have standing.

The Court notes, however, the paucity of allegations against the UBC and McCarron. Plaintiff does not allege that the UBC and McCarron committed even a single predicate act. The sole allegation against the UBC and McCarron is that McCarron ignored a letter sent by Plaintiff. (Am. Compl. ¶¶ 174-78). The letter recounted two of the Individual Defendants' refusal to file one of Plaintiff's grievances. (Id. ¶ 174). While Plaintiff claims that McCarron ignored the letter – which was sent two years after the complained of incident – McCarron in fact sent Plaintiff a response. (Id. ¶¶ 174-75; Letter from McCarron to Plaintiff dated October 28, 2005, UBC/McCarron Mem., Ex. C). [6]

The theory of Plaintiff's case against the UBC and McCarron is based wholly on vicarious liability. According to Plaintiff, the UBC and McCarron "aided, abetted and

---

[6] "In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference to the complaint." Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999). Plaintiff does not, however, object to the Court's consideration of McCarron's letter.

ratified other defendants conduct . . . [and] are vicariously liable for the activities of the locals and its officers . . . ." (Mem. in Opp. to Motions to Dismiss ("Mem. in Opp.") at 16). The Amended Complaint alleges, without any supporting factual allegations, that the Individual Defendants are "agents" of the UBC. (Am. Compl. ¶¶ 17-26). Plaintiff's legal conclusions are not, however, entitled to a presumption of truth. Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 511-12 (S.D.N.Y. 2010). Moreover, while the parties look to labor law to determine whether the UBC can be held liable for the acts of the District Council, the Locals and the Individual Defendants, labor law does not control "the relationship of [an] [i]nternational [union], its districts, local unions, and members for the purpose of applying RICO provisions." New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am., 18 F.3d 1161, 1164 (4th Cir. 1994).

There is more than one approach to vicarious liability under RICO, but "[c]ourts within the Second Circuit generally do not impose vicarious liability under RICO unless the corporate [or union] defendant is a 'central figure' in the RICO scheme." Mikhlin v. HSBC, No. 08-CV-1302(CPS), 2009 WL 485667, at *8 (E.D.N.Y. Feb. 26, 2009); cf. Volmar Distribs., Inc. v. New York Post Co., 899 F. Supp. 1187, 1192 (S.D.N.Y. 1995) ("[C]orporations/unions are not automatically liable under RICO for the actions of their employees."). Plaintiffs seeking to impose vicarious liability must, at a minimum, "show that a corporate [or union] officer . . . had knowledge of or was recklessly indifferent toward the unlawful activity." USC Certified Merchants, LLC v. Koebel, 262 F. Supp. 2d 319, 328 (S.D.N.Y. 2003). Even if such knowledge or reckless indifference is shown, courts "consider other factors, such as the number of high-level employees involved in the racketeering activity, their degree of participation in the racketeering activity, whether these employees themselves committed the alleged predicate acts, and whether the

corporation [or union] substantially benefited from the racketeering activity." Mikhlin,
2009 WL 485667, at *8 (quoting Kovian v. Fulton Cnty. Nat. Bank & Trust Co., 100 F.
Supp. 2d 129, 133 (N.D.N.Y. 2000)).

    The Amended Complaint falls far short of pleading facts sufficient to hold the
UBC vicariously liable for the other Defendants' alleged racketeering activity.[7]  Plaintiff
simply asserts that McCarron and "other officials of UBC . . . had knowledge of, or were
recklessly indifferent toward . . . the unlawful activity." (Am. Compl. ¶ 82).  He claims
that the "Defendants . . . [were] aware of the widespread corruption, including the
commonplace occurrence of RICO predicate acts . . . through tips given to the union's
corruption line and to the Independent Investigator." (Id. ¶ 60).  According to Plaintiff,
"[d]uring the years following the Consent Decree, defendant UBC repeatedly intervened
in the affairs of the union organization defendants and controlled their action for
extensive periods of time." (Id. ¶ 177).  Plaintiff does not, however, allege facts which
show that the UBC's officers were in any way complicit in the wrongs of the District
Council, the Locals and the Individual Defendants.  See Almendolare v. Schenkers Int'l
Forwarders, Inc., 747 F. Supp. 162, 169 (E.D.N.Y. 1990) ("Whether an entity should be
characterized as a 'passive conduit' or a 'central figure' is also contingent on the
complicity of high level officers.").  In enacting RICO, Congress intended "to protect
organizations from criminal infiltration rather than [to] hold them liable." Mikhlin, 2009
WL 485667, at *8.  Even if Plaintiff had standing (he does not), to impose liability on the
UBC based on the allegations in the Amended Complaint would directly contradict
Congress' intent.  See Local 56, United Food & Commercial Workers Int'l, No. 92-2930,
1993 WL 623316, at *3 (D. N.J. Aug. 16, 1993) ("Vicarious liability [under RICO] may

---

[7] Even if the UBC were vicariously liable for the acts of the other Defendants, it is not at all clear why
McCarron would be.

only apply when the organization has derived some benefit from the unlawful activity and imposing vicarious liability does not conflict with the intent of Congress.").  In no event has Plaintiff stated a viable RICO claim against the UBC and McCarron, and for this reason alone, the RICO claims against them must be dismissed.

**b. Standing**

By its terms, RICO grants standing to pursue civil damages to "any person injured in his business or property by reason of a violation of section 1962 . . . ." § 1964(c).  As explained, "[i]n order to bring suit under § 1964(c), a plaintiff must plead (1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." Commercial Cleaning Servs., L.L.C. v. Collins Serv. Sys., Inc., 271 F.3d 374, 380 (2d Cir. 2001).  The Supreme Court has noted that, "[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496-97 (1985) (quoting Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago, 747 F.2d 384, 398 (7th Cir. 1984)).

The phrase "by reason of" in § 1964(c) "has been held to limit standing to those plaintiffs who allege that the asserted RICO violation was the legal, or proximate, cause of their injury, as well as a logical, or 'but for,' cause." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 283-84 (2d Cir. 2006) (quoting Commercial Cleaning, 271 F.3d at 380); see CPT Med. Servs., 375 F. Supp. 2d at 152 (plaintiff must allege that his "injury is proximately caused by the acts constituting the RICO violation."). Anza v. Ideal Steel Supply Corp. teaches that "[w]hen a court evaluates a RICO claim for proximate causation, the central question is whether the alleged violation led directly to the

plaintiff's injuries." 547 U.S. 451, 461 (2006).   A plaintiff "does not have standing if he

suffers an injury that was indirectly (and hence not proximately) caused by the

racketeering activity or RICO predicate acts, even though the injury was proximately

caused by some non-RICO violation committed by the defendants." Baisch, 346 F.3d at

373.  When factors other than the defendant's RICO violation "are an intervening direct

cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of

the defendant's actions." McBrearty v. Vanguard Group, Inc., No 08 Civ. 7650(DLC),

2009 WL 875220, at *2 (S.D.N.Y. Apr. 2, 2009) (quoting McLaughlin v. Am. Tobacco

Co., 522 F.3d 215, 226 (2d Cir. 2008)).

The defendant's racketeering activity must have "caused the plaintiff to suffer

economic loss." McLaughlin, 522 F.3d at 226 (internal quotation marks omitted).  "The

remedial purpose of RICO is to put the injured plaintiff in the same financial position it

would have been . . . absent the misconduct." World Wrestling Entm't, Inc. v. Jakks

Pac., Inc., 530 F. Supp. 2d 486, 521 (S.D.N.Y. 2007) (citing Bankers Trust Co. v.

Rhoades, 859 F.2d 1096, 1106 (2d Cir. 1988)).  As such, RICO plaintiffs must allege

"*actual*, quantifiable injury." McLaughlin, 522 F.3d at 227.  A RICO plaintiff "may not

recover for speculative losses or where the amount of damages is unprovable." Trustees

of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc., 886 F.

Supp. 1134, 1146 (S.D.N.Y. 1995) (citing First Nationwide Bank v. Gelt Funding Corp.,

27 F.3d 763, 768 (2d Cir. 1994)).  Courts have regularly "held that a plaintiff who alleges

injuries that are 'indefinite and unprovable' does not have standing under, and cannot

recover damages pursuant to, RICO." Jakks Pac., 530 F. Supp. 2d at 521 (citing Gelt

Funding, 27 F.3d at 768); Allen v. Berenson Pari-Mutuel of N.Y., Inc., No. 09 Civ.

10289(KMW), 1998 WL 80168, at *3 (S.D.N.Y. Feb. 25, 1998)); see also Evans v. City

of Chicago, 434 F.3d 916, 932 (7th Cir. 2006) ("every court that has addressed this issue

has held that injuries proffered by plaintiffs in order to confer RICO standing must be

'concrete and actual,' as opposed to speculative and amorphous.")

     As with substantive RICO claims, to state a viable RICO conspiracy claim the

plaintiff must allege that his injury was proximately caused by the defendant's RICO

predicate acts.  See Swig Weiler & Arnow Mgmt. Co. v. Stahl, 817 F. Supp. 400, 403

(S.D.N.Y. 1993) ("Under both § 1962(c) and § 1962(d), a plaintiff must prove injury

proximately cased by predicate racketeering acts.").  Standing to assert a RICO

conspiracy claim "may be founded only upon injury from overt acts that are also section

1961 predicate acts, and not upon any and all overt acts furthering a RICO conspiracy."

Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1344 (2d Cir. 1994) (quoting Hecht

v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990)).  Stated otherwise, "a

§ 1962(d) violation requires . . . an agreement to commit the requisite predicate acts,

followed by the commission of a predicate act that proximately causes injury to the

plaintiff."  Gristede's Food, Inc. v. Unkechauge Nation, 532 F. Supp. 2d 439, 448

(E.D.N.Y. 2007).  Since standing under § 1962(d) requires the plaintiff's injury to be

proximately caused by a predicate act, if Plaintiff does not have standing to assert his

substantive RICO claims under § 1962(c), he lacks standing to assert his RICO

conspiracy claims under § 1962(d).

     According to the Amended Complaint, the Defendants' alleged predicate acts of

bribery, extortion and theft (1) "caused plaintiff to be unlawfully fired from several jobs

with defendants"; (2) "caused . . . [plaintiff] to spend extra time on the out of work list

without employment"; (3) "deprived . . . [plaintiff] of benefits that would have accrued

to all union members if not for defendants theft of funds from the benefit and pension

funds"; and (4) "deprived him of rights guaranteed by the CBA, the Consent Decree, and the out of work list, including plaintiff's right to a fair and democratic union." (Am. Compl. ¶¶ 317, 337, 354, 372, 390, 409, 427, 446, 464, 483.)[8]

The Moving Defendants argue that Plaintiff lacks standing to assert RICO claims based on these alleged harms. They contend that any injury suffered by Plaintiff was not proximately caused by the alleged predicate acts. Plaintiff counters by arguing that the Moving Defendants "misconceive[] the injuries Plaintiff is suing for." (Mem. in Opp. at 27.) Once this misconception is corrected, "it is clear that plaintiff has standing to seek redress of his injuries caused by defendants' RICO violation." (Id.)

**i. Firings**

Plaintiff was allegedly fired by seven different contractors because he exercised his rights as a union member and complained about violations of the CBA and Consent Decree. (Am. Compl. ¶¶ 153, 182, 213, 226, 245, 265, 286.) While the Amended Complaint explicitly references Plaintiff being fired as a harm caused by the predicate acts, Plaintiff nevertheless blames the Moving Defendants for "attempt[ing] to distract the Court from plaintiff's injuries which were proximately caused by defendants' action by mischaracterizing plaintiff's claims for lost jobs to be those losses caused by retaliation for his reports to the independent investigator." (Mem. in Opp. at 29.) Despite the fact it is Plaintiff – not the Moving Defendants – who is "mischaracterizing" the claims in the Amended Complaint, at oral argument Plaintiff's counsel conceded that loss of employment does not, in and of itself, give rise to a RICO claim.

There is good reason for Plaintiff's concession: "courts in this circuit and others consistently have declined to accord standing under section 1962(c) to employees who

---

[8] The Amended Complaint also states the Defendants' predicate acts caused Plaintiff to "suffer other damages to which he is legally entitled to recover." (Am. Compl. ¶¶ 317, 337, 354, 372, 390, 409, 427, 446, 464, 483.)

were discharged or otherwise penalized either for 'whistle blowing' activities or for refusing to participate in the alleged racketeering activity." <u>Tarr v. Credit Suisse Asset Mgmt., Inc.</u>, 958 F. Supp. 785, 797 (E.D.N.Y. 1997); <u>see also</u> <u>Donelli v. County of Sullivan</u>, No. 07 Civ. 2157(JGK), 2009 U.S. Dist. LEXIS 66994, at *25 (S.D.N.Y. July 31, 2009); <u>Donohue v. Teamsters Local 282 Welfare, Pension, Annuity, Job Training & Vacation & Sick Leave Trust Fund</u>, 12 F. Supp. 2d 273, 277 (E.D.N.Y. 1998).  Courts generally hold that "any injury flowing from the employer's conduct [i.e., discharging the employee] . . . [is] not sufficiently proximate to the alleged RICO violations for standing purposes." <u>Tarr</u>, 958 F. Supp. at 797 (collecting cases).  In response to the argument that a RICO plaintiff "was discharged as an integral part of the illegal scheme, rather than in retaliation for reporting it," the Second Circuit held that "a differentiation between 'preventative' and 'retaliatory' dismissals in this context would serve no useful purpose." <u>Burdick v. Am. Express Co.</u>, 865 F.2d 527, 529-30 (2d Cir. 1989).  Thus, regardless of whether he was fired because he reported alleged misconduct, or as a part of the Defendants' "illegal scheme," Plaintiff lacks standing to assert RICO claims based on the termination of his employment.

**ii. Theft of Union Benefits**

Plaintiff contends that he has standing to sue under RICO based on the Defendants' theft from the union benefit and pension funds.  (Mem. in Opp. at 28.)  The argument goes that when the Contractor Defendants used off-the-sheet workers (after bribing union officials and extorting union members) they violated 18 U.S.C. § 664 and harmed all union members, including Plaintiff, "by the loss of money not paid into the general union and pension benefits fund."  (Am. Compl. ¶ 93).  By neglecting "to place all the workers on the shop steward report," (<u>id.</u> ¶ 89), shop stewards "participate[d] in

the contractor's theft of money owed to the union benefit and pension funds." (Id.)

According to Plaintiff, because "all union members" were "foreseeable victim[s]" of the

theft, he has standing. (Mem. in Opp. at 27.) Plaintiff, however, grossly oversimplifies

the requirements for RICO standing and ignores relevant case law holding that injuries to

a union as a whole do not provide standing to individual union members.

Courts consistently hold that "shareholders, creditors, and employees of a

corporation lack standing to sue under RICO where their injuries derive from direct

injuries to the corporation itself." Bona v. Barasch, No. 01 Civ. 2289(MBM), 2003 WL

1395932, at *25 (S.D.N.Y. Mar. 20, 2003). And courts have applied "the direct injury

test where a non-corporate entity, rather than one of its members, has been directly

harmed." Id. (citing Papas v. Passias, 887 F. Supp. 465, 470 (E.D.N.Y. 1995)). The

District Court for the Eastern District of New York has explained that, in general, a

plaintiff,

> will not be permitted to bring a suit under RICO, in a personal capacity,
> where the injury he alleges has been incurred by an association or
> organization of which he is a member, and any derivative injury to him is
> no different from that sustained by similarly situated members of the same
> association or organization.

Papas, 887 F. Supp. at 470-71. This general prohibition on members of organizations

suing for derivative injuries shared by all members of the organization recognizes that a

"RICO claim [is] essentially . . . an asset of the association or organization that has been

injured through a violation of 18 U.S.C. § 1962, and that the prosecution of a RICO suit

by a single member in his own right would impair the rights of other similarly situated

members . . . to this asset." Commer v. Am. Fed'n of State, County & Mun. Employees,

No. 01 Civ. 4260(RWS), 2003 WL 21697873, at *3 (S.D.N.Y. July 22, 2003) (citing

Papas, 877 F. Supp. at 471).

Considering the RICO claims of a union member against his local and various union officials, the District Court for the Northern District of New York held that "[a] plaintiff cannot bring a civil suit under RICO, in a personal capacity, where the injury he alleges has been incurred by a union of which he is a member and any derivative injury to him is no different from that sustained by similarly situated members of the same union." Mayes v. Local 106, No. 93-CV-716(NPM)(RWS), 1999 WL 60135, at *3 (Feb. 5, 1999), aff'd 201 F.3d 431 (2d. Cir.1999). Other District Courts in this Circuit "have dismissed RICO claims brought by participants in employee benefit funds based on the direct injury test." Bona, 2003 WL 1395932, at * 25 (citing Donohue v. Teamsters Local 282 Welfare Funds, 12 F. Supp. 2d 273, 278 (E.D.N.Y. 1998) and Diduck v. Kaszynski & Sons Contractors, Inc., 737 F. Supp. 792, 798 (S.D.N.Y. 1990)); see also Vasquez v. Cent. States Joint Bd., 547 F. Supp. 2d 833, 857 (N.D. Ill. 2008) (noting plaintiff's concession that defendant's embezzlement of union funds does not confer standing on individual union members). The First and Fifth Circuits have both held that injuries suffered by all members of a union do not provide RICO standing to individual members of the union. See Bass v. Campagnone, 838 F.2d 10, 13 (1st Cir. 1988) (plaintiffs' claims based on embezzlement from union "cannot be sustained because it alleges no injury peculiar to the plaintiff alone, which does not fall alike upon other members of the local.") (internal citations and quotation marks omitted); Adams-Lundy v. Ass'n of Professional Flight Attendants, 844 F.2d 245, 250 (5th Cir. 1988) ("Any financial improprieties occurred with union funds and directly injured solely the union; appellants suffered only indirect injuries as union members.").

Since any harm suffered by Plaintiff as a result of the Defendants' alleged theft from the union benefit and pension funds is a harm suffered by the union membership as

a whole, he has failed to allege an "injury that is separate and distinct from that allegedly sustained by every other similarly situated member of . . . [the union]." <u>Commer</u>, 2003 WL 21697873, at *4. Plaintiff, therefore, lacks standing to assert a RICO claim based on the Defendants' theft from the union benefit and pension funds.

### iii. Deprivation of Union Rights

Plaintiff alleges that the Defendants' extorted his "intangible rights" under the CBA and Consent Decree, as well as his right to a "democratic union." (Am. Compl. ¶ 317.) He reasons that "[i]t is a tautology that the specific extortion of plaintiff's intangible rights was targeted at plaintiff. Therefore, every extorted intangible right of plaintiff, cost him that intangible right, an injury proximately caused by defendants' acts." (Mem. in Opp. at 29.) But since injury to an "intangible right," without more, does not confer RICO standing, Plaintiff's argument misses the mark.

A union member's "intangible property right to democratic participation in the affairs of their union is property considered extortable 'property' for purposes of the Hobbs Act." <u>United States v. Bellomo</u>, 263 F. Supp. 2d 561, 572 (E.D.N.Y. 2003) (quoting <u>United States v. Local 560 of the Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.</u>, 780 F. 2d. 267, 281-82 (3d Cir. 1985)). But simply because some "intangible rights" are "property" for purposes of *criminal* liability under the Hobbs Act does not mean that extortion of such "property" gives rise to a viable *civil* RICO claim. Moreover, simply because a Hobbs Act violation may support *criminal* RICO liability does not mean that such a violation supports *civil* RICO liability. Indeed, the Supreme Court has cautioned that "there are significant differences between civil and criminal RICO actions." <u>Klehr v. A.O. Smith Corp.</u>, 521 U.S. 179, 188 (1997); <u>see also</u> <u>Ne. Women's center, Inc. v. McMonagle</u>, 868 F.2d 1342, 1349 (3d Cir. 1989) (explaining

that the issues of RICO's "injury requirement" and whether the Hobbs Act covers "extortion of intangible rights" are "analytically distinct.").

The phrase "injured in his business or property" in § 1964(c) "has a restrictive significance which helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff." Maio v. Aetna, Inc., 221 F.3d 472, 483 (3d Cir. 2000) (internal citation omitted) (quoting Steele v. Hosp. Corp. of Am., 36 F.3d 69, 70 (9th Cir. 1994)). A "number of appellate courts have held that a showing of RICO injury requires proof of a 'concrete financial loss' and does not encompass mere 'injury to a valuable intangible property interest.'" Evans v. City of Chicago, 434 F.3d 916, 932 (7th Cir. 2006) (collecting cases); see also Maio, 221 F.3d at 483 ("a showing of injury requires proof of a concrete financial loss and not mere injury to a valuable intangible property interest.").

The plaintiffs in Anderson v. Ayling, 396 F.3d 265 (3d Cir. 2005) brought RICO claims against their international union and various members of the international union and its locals. Much like the Amended Complaint here, the complaint in Anderson told a "seamy and confusing story of union corruption and power struggles." Anderson, 396 F.3d at 267. Among other alleged injuries, the plaintiffs claimed that they were injured by "the corruption of their local." Id. at 271. The Third Circuit affirmed the district court's dismissal of the complaint for lack of standing, holding that any injury caused by the corruption of the plaintiffs' local "is not a cognizable injury that can create RICO standing." Id. The court explained that "[p]laintiffs point to no concrete losses, financial or otherwise, stemming from the alleged corruption of their local." Id.

Union members in Vazquez v. Central States Joint Board, 547 F. Supp. 2d 833 (N.D. Ill. 2008) brought a RICO claim alleging that their union and certain of its

members had extorted their rights under the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 et seq. The court assumed that LMRDA rights are extortable "property" for purposes of the Hobbs Act, but noted that the assumption "does not even begin to address the questions at hand in this private civil RICO suit – namely, whether plaintiffs have shown the requisite tangible injury to business or property, as proximately caused by alleged RICO predicates, so as to have RICO standing in this suit." Vazquez, 547 F. Supp. 2d at 858. After distinguishing the criminal cases relied on by the plaintiffs to show that extortion of their LMRDA rights conferred RICO standing, the court held that "[p]laintiffs have failed to allege the requisite concrete loss of business and property so as to confer RICO standing in this private civil suit." Id. at 860.

The plaintiff in Donohue v. Teamsters Local 282 Welfare, Pension, Annuity, Job Training & Vacation & Sick Leave Trust Funds, 12 F. Supp. 2d 273 (E.D.N.Y. 1998) was a fund manager for a union. After allegedly discovering that union officials were diverting monies from the funds for their own benefit, she was fired and subsequently brought RICO claims against the union and some of its officers. In an attempt to overcome the bar on RICO claims based on retaliatory discharges, the plaintiff argued that she "suffered a loss to her 'property' in that she was deprived benefits under ERISA which . . . constitute 'property.'" Donohue, 12 F. Supp. 2d at 277. More specifically, the plaintiff claimed that she was deprived of "her right, as Fund Manager, to inform fund participants and others of any violations, and her right to sue on behalf of the funds to recover for defendants' fiduciary breaches constitute property under RICO," by the defendants threats of violence and by her termination. Id. Describing the plaintiff's argument as "both novel and creative," the court nevertheless found the argument to be

"unsupported by existing legal authority." Id. The court agreed "with the Fifth and

Ninth Circuits, which hold that an '[i]njury to mere expectancy interests or to an

"intangible property interest" is not sufficient to confer RICO standing.'" Id. at 277-78

(quoting Price v. Pinnacle Brands, Inc., 138 F.3d 602, 607 (5th Cir. 1998)). Dismissing

the plaintiff's RICO claims, the court held that "[p]laintiff's lost rights are too speculative

and insufficient to confer standing under RICO." Id. at 278.

> As in Anderson, Vasquez and Donohue, Plaintiff's claim that the Defendants

extorted his "intangible rights" fails to satisfy the RICO injury requirement. Plaintiff has

not alleged any "concrete financial loss" from the alleged extortion of his right to file

grievances or any other claimed "intangible rights" under the CBA and Consent Decree.

(Am. Compl. ¶ 132.) Plaintiff's claim based on his right to a "democratic union" is even

more nebulous than the corruption-based claim found to be lacking in Anderson. See,

e.g., Breslin v. Brainard, 128 F. App'x 237, 240 (3d Cir. 2005) (holding that injury to

intangible property right to a corruption free and democratic union "is not a cognizable

injury that can create RICO standing." (quoting Anderson, 396 F.3d at 271)). Plaintiff

accordingly lacks standing to assert RICO claims based on the alleged deprivation of his

"intangible rights."

### iv. Extra Days on Out-of-Work List

> Plaintiff claims that he was harmed by the Defendants' "off the sheet worker

schemes." (Am. Compl. ¶ 94.) He contends that when the Defendants used off-the-sheet

workers, union members remained on the out-of-work list longer. This, in turn, caused

union members to lose wages and benefits they would have received but for the use of

off-the-sheet workers. (Id. ¶ 95.) The use of off-the-sheet workers, plaintiff maintains,

could not have occurred without bribes being passed from contractors to union officials.

(Id. ¶¶ 90-91.) Since "union members" are the "intended victims of off the sheet worker schemes," Plaintiff argues that as a union member he "was one of the intended victims and his injuries were caused by the [Defendants'] predicate acts." (Mem. in Opp. at 28.)

In Mayes, the plaintiff claimed that members of his local union "preferentially assign[ed] jobs to friends, relatives and political cronies." Mayes, 1999 WL 60135, at *1. The defendant union officials allegedly did this "as a *quid pro quo* for . . . political support." Id. at *2. Dismissing the plaintiff's RICO claims for lack of standing, the court held that the predicate acts alleged in the complaint "did not injure him alone, but injured Local 106 as a whole." Id. at *4. Thus, "[a]lthough the union might have standing to assert these claims, plaintiff does not." Id.; see also Bass, 838 F.2d at 13 ("plaintiffs' claim cannot be sustained because it alleges no injury peculiar to the plaintiffs alone, which does not fall alike upon other members of the local."). Plaintiff here likewise fails to allege that the Defendants use of off-the-sheet workers caused injury to him alone, as opposed to all union members. Instead, he expressly claims that all union members were the "intended victims of off the sheet worker schemes" and therefore he was "one of the intended victims." (Mem. in Opp. at 28.) Since the Amended Complaint "alleges no injury peculiar to the plaintiff alone, which does not fall alike upon other members of the [union]," Bass, 838 F.2d at 13, he does not have standing to assert RICO claims based on the alleged use of off-the-sheet workers.

Even if Plaintiff could state a RICO claim based on a harm suffered by all union members, the Amended Complaint does not allege – with even a modicum of specificity – that Plaintiff in fact lost wages or benefits because he was forced to remain on the out-of-work list longer. Throughout the Amended Complaint, Plaintiff alleges that when he was assigned to a job, he discovered the use of off-the-sheet workers. (Am. Compl. ¶¶

141,194, 217, 284.)  The Amended Complaint does not, however, allege a single instance

when Plaintiff was unemployed, on the out-of-work list, and forced to remain on the list

longer because of the use of off-the-sheet workers.[9]  Instead, Plaintiff simply assumes –

without supporting factual allegations – that because off-the-sheet workers were used, he

was harmed.

Moreover – and perhaps most importantly – to the extent Plaintiff is right to infer

that because off-the-sheet workers were used, they were used when he was on the out-of-

work list and therefore caused him harm, any injury Plaintiff might have suffered by

remaining on the out-of-work list longer is far too speculative to provide standing.  See

Evans, 434 F.3d at 932 ("every court that has addressed this issue has held that injuries

proffered by plaintiffs in order to confer RICO standing must be 'concrete and actual,' as

opposed to speculative and amorphous.").  The Amended Complaint does not allege how

many off-the-sheet workers were used; how many carpentry positions were available

when off-the-sheet-workers were used; or how many union members were on the out-of-

work list when off-the-sheet workers were used.  Plaintiff makes no attempt to explain

how long he was forced to remain on the out-of-work list or the amount of pay and

benefits he lost as a result of his extended stay on the out-of-work list.  Any

determination of damages based on the alleged use of off-the-sheet workers would be

nothing more than rank speculation.  Since "there is no plausible set of facts, consistent

---

[9] Plaintiff does allege that when he went to work for non-party Adams Management Group, Inc. ("Adams")
in February, 2005, he was told there would only be one day of work because Adams was "moving men
around to avoid the 50/50 list." (Id. ¶ 194.)  He asserts that because Adams was trying to avoid the 50/50
Rule, some unidentified defendant must have been bribed. (Id. ¶ 195.)  Further, by "aiding and abetting"
Adams' violation of the 50/50 Rule, Local 608 North (one of the Locals) violated the CBA and Consent
Decree "which proximately leads to the reasonable belief [sic] their direct involvement in bribery to assist
the manipulation of the 50/50 list and other job rules." (Id. ¶ 197.)  It is, however, generally agreed that
there is no private cause of action for aiding and abetting a RICO violation.  See Ross v. Patrusky, Mintz &
Semel, No. 90 Civ. 1356(SWK), 1997 WL 214957, at *11 (S.D.N.Y. Apr. 29, 1997).  And in any event,
Plaintiff does not claim that he was injured by Adams' alleged circumvention of the 50/50 Rule.  Moreover,
Plaintiff's allegations regarding Local 608 North's involvement in Adam's chicanery are conclusory and
fail to state a plausible claim.

with Plaintiff's allegations, that makes the alleged injury sufficiently concrete to state a RICO claim," Jakks Pac., 530 F. Supp. 2d at 521, Plaintiff lacks standing to assert RICO claims based on the harm he allegedly suffered due to the use of off-the-sheet workers.[10]

Since Plaintiff does not have standing to sue under RICO, the RICO claims in Counts I through XVIII are dismissed.

## V. Intentional Infliction of Emotional Distress

In New York, the threshold for intentional infliction of emotional distress claims is "very high." Castro v. Local 1199, Nat'l Health & Human Res. Employees Union, 964 F. Supp. 719, 732 (S.D.N.Y. 1997). The elements of a claim for intentional infliction of emotional distress are: "(i) extreme and outrageous conduct, (ii) an intent to cause – or disregard of substantial probability of causing – severe emotional distress, (iii) a causal connection between the conduct and the injury, and (iv) the resultant severe emotional distress." Lau v. S&M Enters., 898 N.Y.S.2d 42, 43 (App. Div. 1st Dep't 2010). The

---

[10] At oral argument, Plaintiff's counsel likened the harm allegedly suffered by Plaintiff to the damages sustained by the plaintiffs in Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639, 128 S. Ct. 2131 (2008). In Bridge, however, the Supreme Court did not consider the question of whether the plaintiffs' damages were too speculative to confer RICO standing. Instead, the Court resolved (in the negative) the narrow question of "whether first-party reliance is an element of a civil RICO claim predicated on mail fraud." Id. at 2137, 2139. But in any event, any similarities between the damages suffered by the plaintiffs in Bridge and the damages allegedly suffered by Plaintiff are more apparent than real.

The plaintiffs in Bridge were bidders at tax sale auctions who claimed that they were harmed when the defendants perpetrated a scheme to submit multiple bids in violation of the county's auction rules. Id. at 2135-36. Each of the defendants' illegal bids reduced the plaintiffs' chance of winning any given auction. Id. at 2136. The plaintiffs accordingly claimed that the defendants' scheme "deprived them and other bidders of their fair share of liens and the attendant financial benefits." Id.

In Bridge, the number of available tax liens was fixed and knowable, as was the number of illegal bids submitted by the defendants. The bid amounts were not an issue because all bidders offered the lowest possible bid (hence the county's rule limiting the number of bids per bidder). Id. In effect, the auction was a zero-sum game: each illegal bid reduced the number of tax liens available to the legitimate bidders. And the game was played in a fixed universe of facts reasonably susceptible to discovery.

Here, things are not so tidy. To fix Plaintiff's damages with any degree of certainty requires, at a minimum, knowing how many off-the-sheet workers were used; whether the off-the-sheet workers were used when Plaintiff was on the out-of-work list; and Plaintiff's position on the out-of-work list when the off-the-sheet workers were used. Moreover, there are other factors which could have contributed to the length of time Plaintiff spent on the out-of-work list besides Defendants' alleged off-the-sheet workers schemes. For instance, other non-parties might have also used off-the-sheet workers. Besides claiming that he was forced to spend "extra days" on the out-of-work list, (Am. Compl. ¶ 317), Plaintiff makes no attempt to explain how he plans to quantify his damages. Plaintiff's inability to explain how he intends to put a figure on his loss is testament to the fact that – unlike in Bridge – "there is no reasonable means of calculating . . . [damages] in this case." McLaughlin, 522 F.3d at 229.

defendant's conduct "must be so outrageous and extreme as to go beyond all possible bounds of human decency." Castro, 964 F. Supp. at 733. "Mere threats, annoyance or other petty oppressions, no matter how upsetting, are insufficient . . . ." Owen v. Leventritt, 174 A.D.2d 471, 472 (App. Div. 1st Dep't 1991).  Recovery may be had "only where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation." Id.

Plaintiff's intentional infliction of emotional distress claim is asserted against two of the Individual Defendants, one of the Locals, the District Council and the UBC. According to the Amended Complaint, by intimidating Plaintiff in order to "preclude him from complaining and from protecting his rights," these Defendants caused him "severe mental and emotional distress." (Am. Compl. ¶ 509.)  As a result, "[P]laintiff has been and continues to be tense, nervous, suffering great mental anguish, fearful for his life and limb and deprived of the right to enjoy his life free of such nightmarish fears." (Id. ¶ 512.)

Plaintiff's allegations of intimidation do not amount to conduct "so outrageous and extreme as to go beyond all possible bounds of human decency." Castro, 964 F. Supp. at 733.  Plaintiff does not allege that his life was threatened or that he was threatened with physical harm.  At best, he alleges that some Defendants used foul language and said things "menacingly" and in a "threatening tone."  (Am. Compl. ¶¶ 170, 209, 210.)  But foul language and run-of-the-mill acts of intimidation do not constitute "extreme and outrageous conduct," Lau, 898 N.Y.S.2d at 43, and Plaintiff has failed make out a claim for intentional infliction of emotional distress.

In any event, even if the alleged misconduct went beyond the bounds of human decency, Plaintiff's claim is clearly time-barred.  Intentional infliction of emotional

distress claims are subject to a one-year statute of limitations.  See Rafter v. Liddle, No.

05 CV 4296(TPG), 2006 WL 2255093, at *10 (S.D.N.Y. Aug. 4, 2006) (citing N.Y.

C.P.L.R. § 215(3)).  "Where a plaintiff is subject to a sustained pattern of abuse, the

continuing tort doctrine applies, and the statute of limitations begins to run after the last

actionable abuse has occurred."  Colliton v. Cravath, Swaine & Moore LLP, No. 08 Civ.

0400(NRB), 2008 WL 4386764, at * 10 (S.D.N.Y. Sept. 24, 2008).  All of the alleged

acts of intimidation occurred months and years before July 3, 2007, which is one year

before the Plaintiff commenced this action.  Plaintiff speculates that one of the Individual

Defendants had him fired on July 7, 2007.  (Am. Compl. ¶¶ 287-88.)  But even if the

Defendant did have Plaintiff fired, Plaintiff's discharge does not constitute "actionable

abuse."  Plaintiff's intentional infliction of emotional distress claim in Count XIX is

dismissed.

### Conclusion

        The motions to dismiss are GRANTED.  Since Plaintiff does not have standing to

recover under RICO, and has failed to state a viable claim for intentional infliction of

emotional distress, the Amended Complaint is DISMISSED, sua sponte, in its entirety.

See Wachtler v. County of Herkimer, 35 F.3d 77, 82 (2d Cir. 1994) ("The district court

has the power to dismiss a complaint sua sponte for failure to state a claim so long as the

plaintiff is given notice and an 'opportunity to be heard.'").  The Clerk of Court is

directed to enter judgment accordingly.

Dated: New York, New York
        August 2, 2010

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge